David M. Shaby II, Esq. (97871)
  dshaby@shabyandassociates.com
R. Christopher Harshman, Esq. (248214)
  charshman@shabyandassociates.com,
DAVID M. SHABY II & ASSOCIATES, APC
11949 Jefferson Boulevard, Suite 104
Culver City, California 90230
Telephone:  (310) 827-7171
Facsimile:    (310) 822-8529
Service address: docket@shabyandassociates.com

*Attorneys for Torrance Airport Association*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Torrance Airport Association, Chapter of California Pilots Association, a California Nonprofit Public Benefit Corporation,<br><br>Petitioner/Plaintiff,<br><br>vs.<br><br>City of Torrance, a California municipal corporation and ROES 1 through 10,<br><br>Respondent/Defendants. | Case no. CV 24-2692-JFW (MRWx)<br><br>Assigned to the Hon. John F. Walter<br><br>VERIFIED AMENDED PETITION FOR WRITS OF (1) ADMINISTRATIVE MANDAMUS (CAL. CODE CIV. PROC. § 1094.5); (2) TRADITIONAL MANDATE (CAL. CODE CIV. PROC. § 1085); (3) OTHER EXTRAORDINARY RELIEF; (4) DECLARTORY RELIEF (28 U.S.C. §§ 2201-2202); AND (5) INJUNCTIVE RELIEF |

Petitioner TORRANCE AIRPORT ASSOCIATION, CHAPTER OF CALIFORNIA PILOTS ASSOCIATION ("TAA"), pursuant to Fed. R. Civ. P. 15(a)(1)(B), hereby brings the following Verified Petition for Writs of Administrative Mandamus and Traditional Mandate ("Petition") against Respondent CITY OF TORRANCE ("City"), and ROES 1 through 10, and allege as follows:

## PARTIES

1.     TAA, a California Nonprofit Public Benefit Corporation, is now, and at all relevant times mentioned herein, has been registered and approved to conduct business in the State of California, County of Los Angeles with its principal address 2785 Pacific Coast Highway #E164, Torrance, California 90505. TAA was initially formed in 1991 as

Torrance Airport Boosters Association with its Articles of Organization filed with the State of California Secretary of State ("Secretary") on February 8, 1991. One of its stated purposes is the "[p]reservation and enhancement of Torrance Airport as a public use facility." On August 16, 1995, Torrance Airport Boosters Association filed with the Secretary a Certificate of Amendment of Articles of Incorporation changing its name to TAA.

2.    City is now, and at all relevant times mentioned herein, a California municipal corporation, a charter city, located in the County Los Angeles and the owner of Torrance Municipal Airport.

3.    Respondents ROES 1 through 10 inclusive, whether individual, corporate, associate, or otherwise, are fictitious names of Respondents whose true names and capacities are, at this time, unknown to Petitioner. Petitioner allege that at all times herein mentioned, each of the Respondents sued herein as ROE was acting for himself/herself, or itself as an agent, servant, and employee of his/her or its co-respondents, and in doing the things hereinafter alleged, was acting within the scope of authority as that agent, servant and employee and with the knowledge, permission and/or consent of his/her or its co-respondents, and each of those factiously named respondents, whether acting for himself/herself or itself or as an agent, corporation, association, or otherwise, is in some way liable or responsible to Petitioner. At the time as Respondents' true names become known to them, Petitioner will seek leave to amend its Petition to insert those Respondents' true names. Reference herein to Respondents, without any other limitation, shall include both the specifically named and fictitiously named Respondents.

<u>VENUE AND JURISDICTION</u>

4.    This action was originally brought in the Superior Court of the State of California for the County of Los Angeles (the "Los Angeles Superior Court"), and removed by the City.

AMENDED PETITION

SHABY & ASSOCIATES

5.      Venue was originally proper in the Los Angeles Superior Court per Code of Civil Procedure section 395(a) as the acts and omissions complained of herein occurred, and the property affected by those acts is located in Los Angeles County.

6.      The Los Angeles Superior Court Court has subject matter jurisdiction over this matter, pursuant to Code of Civil Procedure sections 1085 and 1094.5. TAA is an aggrieved person, as a person who itself or through a representative, appeared at the public hearings of the City Council and objected to the City's adoption of Ordinance No. 3927 ("Landing Fee Ordinance").

This Court has jurisdiction over this case as it involves federal questions. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)). "Except as otherwise provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

7.      This Court would have had original subject matter jurisdiction over TAA's claim pursuant to 28 U.S.C. § 1331 had TAA elected to file this action initially in federal court, because of the pervasive federal regulation of aviation and the fact that if the City is allowed to dictate aircraft operations and charge unreasonable fees in an exclusive scheme, it will be in violation of law codified in the United States Code.

8.      This Court has personal jurisdiction over each party in this action because each of them is either organized under the laws of the State of California, incorporated in,

1   and/or qualified to conduct business, or conducting business, in the State of California and

2   the County of Los Angeles.

3       9.      The real property which is the subject of this Petition is located at and

4   commonly known as Zamperini Field or Torrance Municipal Airport with the

5   International Civil Aviation Organization ("ICAO") identifier of KTOA.

6       10.     This action is commenced within the time limits imposed for this action

7   under Code of Civil Procedure sections 1085 and 1094.5. Further, TAA has exhausted all

8   available legal remedies prior to filing this Petition.

9       11.     An ordinance is a legislative act that is reviewable by writ of mandate. (Yes in

10  My Back Yard. v. City of Culver City (2023) 96 Cal.App.5th 1103, 1112-13.)

11      12.     In accordance with Code of Civil Procedure section 1094.6(c), TAA has

12  concurrently filed a request for City to prepare the administrative record.

### TORRANCE MUNICIPAL AIRPORT

13      13.     The City of Torrance owns and operates an airport, originally known as the

14  Lomita Flight Strip and now known formally as Zamperini Field, informally as the

15

16  Torrance Municipal Airport (the "Airport").

17      14.     The Airport as the Lomita Flight Strip was built by the Federal Works

18  Administrator under the Defense Highway Act of 1941, as California Project FS-5.

19      15.     On March 5, 1948, the United States executed a Quitclaim Deed to City for

20  a portion of the Airport property. As part of this Quitclaim Deed, City was required to not

21  "limit its usefulness as an airport."

22      16.     TAA is informed and believes, based on its review of publicly recorded

23  documents and publicly available correspondence obtained via the Freedom of

24  Information Act, that on March 22, 1956, the United States and the City entered into a

25  deed conveying the "lands or interests in lands" upon which the Airport sits to the City, on

26  the condition that the City "will maintain the project constructed thereon," i.e., as the

27  Federal Aviation Administration has interpreted (in, e.g. an April 7, 2004 letter from Mark

28  McClardy, Manager, Airports Division, FAA, "coordinated with the Airports Division and

SHABY & ASSOCIATES

the Office of the Regional counsel at the FAA Western-Pacific Region, and the Office of Airports and the Office of the Chief Counsel at Headquarters"), that the City maintain the Airport as an Airport. This deed was accepted by a resolution approved by the then Mayor of the City on May 1, 1956.

## TAA'S OPERATIONS AT THE AIRPORT

17.    Over 25 years ago, TAA began operations in support of the Airport. At the time of filing, TAA had 148 Airport user members, many of whom have aircraft that are subject to the Landing Fee Ordinance.

## CITY'S ATTACK ON FLYING AIRCRAFT

18.    On October 25, 1977, under Subject 10, Airport Noise Ordinance, City Council separately created, approved, and adopted Resolution No. 77-215, a Resolution of the City Council of the City of Torrance Reaffirming a Previously Adopted Policy to Institute a Program of Aircraft Noise Abatement and Directing the City Manager and Other City Officials to Take Certain Steps to Implement Such Program. In the fifth Whereas clause of Resolution No. 77-215, it states, "[T]he volume of flights emanating from Torrance Municipal Airport will be controlled at a level compatible with community tranquility...." Section 1 of Resolution No. 77-215 states, "That it hereby reaffirms the noise abatement policies for the Torrance Municipal Airport which it has previously adopted (supplementary to those polices which are the subject of the noise abatement ordinance), to wit:" Section 1, Item 16 of Resolution No. 77-215 states, "That the number of flight schools on the Airport be limited to six (the number of schools now operating)." ("6-Flight School Limitation".) Section 1, Item 21 of Resolution No. 77-215 states, "That the City Manager seek alternative training fields for training flights, particularly touch and go and stop and go operations."

19.    In November 1981, City published the Torrance Municipal Airport Aircraft Noise Control and Land Use Compatibility Study ("ANCLUC Report"). On page 1-1 of the ANCLUC Report, it states, "The long history of over 1000 flight operations per day at Torrance Municipal Airport (TOA) has produced conflicts with surrounding residential

land uses that were sufficient to cause the City to initiate a comprehensive aircraft noise abatement program."

20. On December 14, 2021, City Council considered Agenda Item 9H, Community Development – Award Consulting Services Agreement for Airport Noise Monitoring System and Authorize an Additional Environmental Quality Officer. Expenditure: $627,078 (Non-General Fund). Numerous comments were made complaining about flying aircraft from flight schools.

21. On March 29, 2022, City Council considered Agenda Item 9B, Community Development – Accept and File Torrance Municipal Airport (Zamperini Field) Noise Abatement Update. Expenditure: None. During consideration of this Agenda Item, City Council listened to discussions on the Torrance Municipal Code Section 51.2.3(e)'s prohibition on early left turns and the number of flights due to the flight schools at Torrance Municipal Airport. Numerous comments were made complaining about aircraft flying over homes and that something has to be done.

22. On November 8, 2022, City Council considered Agenda Item 9I, City Attorney, Community Development, and General Services – Accept and File Torrance Municipal Airport (Zamperini Field) Noise Abatement and Airport Operations Update and Review and Provide Direction on Implementation of Landing Fees. Expenditure: None. During consideration of Item 9I, numerous comments were made complaining about flying aircraft. One commenter said, "The Walteria neighborhood has been bombarded by south training pattern flights from flight schools...." "Torrance should not allow any private flight school to use a public resource for its own benefit while disrespecting the residents who live near that resource and help pay for it through their taxes. The city should either permanently reduce the number of flight schools that can operate out of Torrance Airport..." Another commentor said, "The city should address this issue by incorporating the following enforcement strategies: [¶]...[¶] Restrict the number of training flights, ensuring that they turn at the ocean when making their loops. Currently there are 7 flight training schools at the Torrance Airport, which is too many for

11624221

SHABY & ASSOCIATES

a municipal airport surrounded by so many residential tracts. There are only two flight training schools each at the Hawthorne and Santa Monica Airports." Further, Ms. Ramirez gave a staff presentation on Item 9I, in which she said the number of repetitive flights over surrounding neighborhoods has increased, commenting: "An additional tool to curb the number of repetitive flights would be the implementation of landing fees." Council member Lewis stated: "So I am in 110 percent in support of trying to figure out a viable solution if that is landing fees or...." Council member Griffiths agreed: "Again, there are fee for landing fees that should be a no-brainer."

23.    Now driven by the resident complaints and City Council's hostility to flying aircraft, City Council embarked on a campaign to severely limit aircraft flying overhead. This hostility has come to a feverous pitch when City Council decided to take a number of actions to curb flying aircraft under City Council Agenda Item 9A, Transportation Committee - Accept and File April 12, 2023 Meeting Minutes and Provide Direction Regarding Airport Landing Fees, Air Noise Mitigation Efforts, and Phase Out of Leaded Gas. Expenditure: None on July 25, 2023. During the course of considering Agenda Item 9A, numerous comments were made about noise from flying aircraft. "It is not uncommon to receive complaints of low-flying noisy aircraft west of Anza Avenue and Pacific Coast Highway." (Meeting time, 2:33:15.) "You know less people are going to want to fly and quite honestly I think that's really the end goal is to reduce the amount of traffic over our skies." (Id. 2:57:50.) "A lot of the email complaints that we get is are people that are doing those constant circles over people's houses." (Id. 3:02:13.) "The loud noise and frequency of planes is intolerable, I can no longer enjoy my home or yard without constant revving of engines flying low overhead at time them plane going over every minute." (Id. 3:44:15.) "It would eliminate a ton of noise over all of our HOA area when the pilots miss that they kind of cut right over our neighborhood and that's what we're getting this really low you know flying noise." (Id. 4:12:41.) "Nonstop fly [ing] needs to stop." (Id. 4:19:37.) "Hopefully, we will be able to hear a little bit without a whole of airplane noise flying overhead." (Id. 8:05:48.) The reason for the landing fees and the action being considered

SHABY & ASSOCIATES

was to regulate and limit flying aircraft. "The Transportation Committee (Committee) met on December 14, 2022 and April 12, 2023 to receive input and provide direction regarding concerns about the Torrance Municipal Airport - Zamperini Field (Airport). Items discussed were options for reduction of aircraft operations and noise[.]" And, "Discussion from both Torrance residents and the aviation community was heard, each with proposals and feedback as *how to best mitigate the* noise and *frequency of flights in the areas surrounding the Airport.*" (Emph. added.) During public comment on Item 9A, Jim Gates, an officer and member of TAA, Christy Haworth, Michael Calabrese, Lee Unger, Anne Minder, Marilyn McPoland, Richard Smith, Richard Shaw, Marianne Wightman, Eric Hansen, Ronald K. Williams, Oded Yossifor, Lon Sobel, Linda Abrams, Walter Tondu, Venessa Gibson, Emilio H. Morales, Gorge Cohen, Scott Osborn, Betty Taylor, Brandon Mercade, Stephen D. Nordel, Eric Roth, and others objected that landing fees are the answer to reducing flying aircraft.

24.    Also, during City Council's consideration of Agenda Item 9A on July 23, 2023, Council member Mattucci stated, "On December 14, 2022, and April 12, 2023, the Transportation Committee met to receive input and provide direction regarding concerns about the Torrance Municipal Airport - Zamperini Field. Items to discuss were operation for reduction of aircraft operations and noise, including the limitation and revision of runways, enforcement of early left turn violations, and the commissioning of a noise study to potentially expand the existing noise monitoring system. Additional topics includes the implementation of landing fees and the development of a voluntary letter of agreement between the Torrance based six fixed-wing flight operations and the City of Torrance. Discussion from both Torrance residents and the aviation community was heard, each with proposals and feedback as to how best mitigate the noise and frequency of flights in the area surrounding the airport." Council member Sheikh stated, "So even with the landing fee, I mean, that's a deterrent, but there is no promise that it would reduce the noise level." Council member Sheikh also asked a commenter whether landing fees would reduce noise pollution, to which the commenter replied, "Yes, sir." Council member

SHABY & ASSOCIATES

Mattucci further stated, "So on Item 209 A [sic], approve implementation of landing fees. I'm a big supporter of landing fees." He went on to say, "And quite honestly, I think that's the end goal, to reduce the amount of traffic over our skies."

25.    On July 25, 2023, during the proceedings on City Council Agenda Item 9A, a motion was made and carried to impose landing fees.

26.    On September 12, 2023, City Council considered Agenda Item 9F, City Manager and City Attorney – Reconsideration of a Council Action Not to Ban Touch and Goes at Torrance Municipal Airport – Zamperini Field. Expenditure: None. Numerous comments were made complaining about flying aircraft.

27.    On October 17, 2023, City Council considered Agenda Item 9G, City Manager and City Attorney – City Council Consideration of a Ban on Touch and Goes at Torrance Municipal Airport – Zamperini Field. Expenditure: None. Numerous comments were made complaining about flying aircraft.

28.    On November 14, 2023, City Council considered Agenda Item 10B; during public comment, Kety Chu, Cheryl Carter, Aircraft Owners and Pilots Association, Frank Vidjak, Laurice Churchill (also stated that landing fees are not needed to offset City's costs), Christy Carter, Christy Haworth, Taylor Brodsky, Michael Haworth, Amir Fadlallah, Thomas W. LaGrelius, John Renquist, Jeff Wachner, Daniel Catugy, Dyan De Vlede, and others all objected to the landing fees; yet, City Council still decided to approve a contract for the logging and collection of landing fees.

29.    On November 28, 2023, City Council conducted a public hearing and the first reading of the Landing Fees Ordinance under Agenda Item 10B. Sean Flyn, Grace Flynn, Ken Brummage, Bill Nelsen, Edward Hurst, Linda Howard, Chris Schane, Dyan Van De Velde, Michael Cannata, Jim Gates, Eileen Bardolph, Michael Stauber, Jose Alanjene Stohner, Zoltan Taguibao, Richard McKay, Richard Bohner, Chris Parker, Gregory Robert, AOPA, Laurice Churchill, and others objected to the imposition to landing fees. City Council nonetheless adopted the Landing Fees Ordinance.

30.     On December 12, 2023, City Council conducted the second reading of the Landing Fees Ordinance and adopted it as Ordinance No. 3927. This action amended Torrance Municipal Code sections 51.2.30, "Definition of Revenue Operations" and 51.2.31, "Fee for Revenue Operations," and repealed section 51.2.32, "Refusal for Clearance."

31.     On February 1, 2024, the Landing Fee Ordinance went into effect.

### LANDING FEES ORDINANCE IS PREEMPTED BY FEDERAL LAW

32.     City regulation of flying aircraft is additionally preempted by federal law. As an overarching matter, the regulation of aircraft flight rests solely with the Federal Aviation Administration ("FAA"). Per Title 49 United States Code section 40103(a)(1), "The US Government has exclusive sovereignty of airspace of the United States." This means that any attempt by City to regulate the airspace above Torrance Airport has been preempted. This includes the regulation of flights.

33.     The exclusive jurisdiction of the U.S. Government over airspace is fundamental. It has long been "the intent of Congress that there should be uniform national policy with respect to air safety" (*Int'l Aerobatics Club Chapter 1 v. City of Morris*, 76 F. Supp. 3d 767, 782 (N.D. Ill. 2014)), against the "obvious peril [of] uneven enforcement of nationally applicable regulations throughout the national airspace." *Id.* In *City of Tipp City v. City of Dayton*, the court denied a motion to remand a case that challenged airport noise. The court stated: "In light of the federal government's extensive control over aircraft noise regulation [...] the federal interest in this case is substantial. The Court, therefore, concludes that a prima facie showing has been made that Plaintiffs' nuisance claim, although stated in terms of state law, "arises under" federal law, and that this Court has subject matter jurisdiction over same." *Id.*, 204 F.R.D. 388, 396 (S.D. Ohio 2001).

34.     Both in 2020 and 2022, the FAA repeatedly told City it cannot regulate flight; only the FAA can. In a letter dated February 18, 2020, to the Torrance Airport Association, the FAA stated, "Congress has long vested the FAA with authority to regulate

SHABY & ASSOCIATES

the areas of airspace use, management and efficiency; air traffic control; safety; navigational facilities; and aircraft noise at its source." In response to a question about Torrance Municipal Code section 5.2.3(e), which prohibits aircraft from turning left until it has reached the ocean or attained an altitude of fifteen hundred (1,500) feet, the FAA readily struck it down explaining:

> "Because the Torrance code provision applies to aircraft in flight, it is not consistent with the Federal statutory and regulatory framework described above. Enforcement of the provision would be at odds with various court opinions. As noted, state and local governments lack the authority to regulate airspace use, management and efficiency; air traffic control; and aircraft noise at its source. Federal courts have found that a navigable airspace free from inconsistent state and local restrictions is essential to the maintenance of a safe and sound air transportation system."

35.    In response, by letter dated August 16, 2021, and then through its attorneys on September 20, 2022, City asked the FAA if the early left turn prohibition was grandfathered. The FAA said no. Specifically, weighing in on another attempt by the City to regulate aircraft in flight[1], The FAA sent the City's counsel a letter dated December 16, 2022 (the "FAA Letter"). In that FAA Letter, the FAA was unambiguous that federal law does not permit the City to enact "restrictions directing how aircraft may operate in the navigable airspace (expressly an FAA function beyond the authority of an airport proprietor)." *Id.*, p. 2. The FAA, in this letter, quoted (*Id.*, pp. 2–3) the United States Court of Appeals for the Second Circuit (*National Helicopter Corp. of America v. City of New York* (2d Cir. 1998) 137 F.3d 81, 92):

> This argument, as the trial court recognized, evidences a misunderstanding of federal aviation law. Congress, the Supreme Court, and we have consistently stated that the law controlling flight paths through navigable airspace is completely preempted. *See, e.g.,* [*British Airways*] *Concorde I*, 558 F.2d at 83 ("[L]egitimate concern for safe and efficient air transportation requires that exclusive control of airspace management be concentrated at the national

---

[1] TMC § 51.2.3(e): "Aircraft taking off to the west shall not turn left until they have either reached the ocean or attained an altitude of fifteen hundred (1,500) feet."

[2] *British Airways Bd. v. Port Authority of New York* (2d Cir. 1977) 558 F.2d 75, 83.

SHABY & ASSOCIATES

level."); *City of Burbank*[3], 411 U.S. at 626–27, 93 S.Ct. at 1856–57 (recognizing the federal government's possession of exclusive national sovereignty in U.S. airspace); 49 U.S.C. § 40103(a)(1) (stating that the federal government has "exclusive sovereignty of airspace of the United States"). The proprietor exception, allowing reasonable regulations to fix noise levels at and around an airport at an acceptable amount, gives no authority to local officials to assign or restrict routes. As a result, the City unlawfully intruded into a preempted area when it curtailed routes for the flights of certain Heliport aircraft. This condition was properly enjoined.

36.     On April 12, 2023, the City's Transportation Committee was presented with options to provide direction on reducing allowable flights. One of those options was to impose landing fees.

37.     On information and belief, TAA thereon alleges that Ordinance No. 3927 was adopted for the improper purpose of regulating flying aircraft by reducing the number of flights into the Airport by imposing a discouraging landing fee on aircraft. Regulating flying aircraft is clearly preempted by federal law.

38.     As of February 1, 2024, City is in the process of invoicing and collecting landing fees.

39.     As documented by the City's own records, flight operations have been severely impacted at the Airport, falling to approximately fifty percent (50%) of those seen at the Airport during comparable time periods in 2023, before the landing fee ordinance was implemented.

40.     As of at least September 26, 2024[4], the City has brought administrative charges against at least one pilot accused of performing a now-prohibited "low approach" operation, a wholly aeronautic activity fully within the purview of the FAA.

---

[3] *City of Burbank v. Lockheed Air Terminal Inc.* (1973) 411 U.S. 624, 626 [93 S.Ct. 1854, 1856, 36 L.Ed.2d 547]

[4] In response to correspondence from the undersigned, the City ultimately at the last minute took the hearing on this violation off calendar and postponed it indefinitely, but has not canceled the hearing nor dismissed the alleged violation.

SHABY & ASSOCIATES

41.     Serious questions additionally exist concerning the City's administrative review process for these violations, even if they were not otherwise in conflict with federal law. The City's process (apparently; the statutes are confusingly drafted and contradictory) provides only for an appeal from the decision of the administrative hearing board to the City Council, whose decision "shall be immediately final and conclusive." Torrance Municipal Code § 11.54. This is in violation of the Separation of Powers requirements of the California State Constitution (Cal. Const. Art. III, § 3) and the United States Constitution (see, e.g., *Boumediene v. Bush*, 553 U.S. 723, 742 (2008); *Hamdan v. Rumsfeld*, 548 U.S. 557, 638 (2006) (Kennedy, J., concurring).

## ADOPTION OF LANDING FEES ORDINANCE IS IN VIOLATION OF THE CITY'S OBLIGATIONS UNDER FEDERAL LAW

42.     The City, in enacting the landing fees ordinance specifically drafted to carve out an exception for Robinson Helicopter Company, Incorporated, is in violation of the "exclusive rights" provision codified at 49 U.S.C. § 40103(e)[5].

43.     The Airport "an air navigation facility on which Government money has been expended."

44.     The City of Torrance received federal airport funds (grants) on at least June 22, 1966, and FAA Order 5190.2R2[6] and the Airport's Federal Aviation Administration ("FAA") Form 5010 both identify it as being subject to the "statutory Exclusive Rights Prohibition," referring to Section 401030(e)[7].

---

[5] "A person does not have an exclusive right to use an air navigation facility on which Government money has been expended."

[6] *Available at* https://www.faa.gov/documentLibrary/media/Order/5190.2R.pdf

[7] Although the City disputes that it continues to be obligated under this "exclusive rights" provision, the plain text of the statute makes clear that there is no expiration date; once federal money is spent on an airport, the airport remains obligated under section 40103(e). recently in an enforcement action brought by another Airport user before the FAA under 14 C.F.R. Part 16 (*Sling Flying Club LLC v. City of Torrance*, FAA Docket No. 16-23-20)[7], on January 31, 2024, the City brought a motion to dismiss claiming it was not bound by any federal obligations in its operation of the Airport (49 U.S.C. § 40103(e) was specifically raised by the complainant in that action); the FAA did not rule on the

SHABY & ASSOCIATES

45.      The exclusive rights provision is the oldest federal obligation affecting federally funded airports … The prohibition against exclusive rights [was] recodified at 49 United States Code (U.S.C.) 40103(e)) and applies to any airport upon which any federal funds have been expended." FAA Order 5190.6B[8], Airport Compliance Manual, section 8.3(b).

46.      The City, in the actions taken detailed herein, amended its Municipal Code with a new Section 51.2.30[9], which contains subpart (a): "A landing fee shall be charged to any individual or entity landing an aircraft at Torrance Airport. Military, public safety, and medical operations shall be exempt from landing fees. Landings on private helipads[10] (as used in this section, a private helipad is a helipad that has been authorized by the City of Torrance and is operated and maintained by a leaseholder on their leasehold. A private helipad is not operated or maintained by the City of Torrance nor supported by funds from the City of Torrance) that are operated and maintained by a leaseholder pursuant to a lease with the City of Torrance shall be exempt from landing fees."

47.      The last exemption is the City of Torrance's way of exempting Robinson Helicopter from paying landing fees that all other users of the airport must now pay, and creating an "exclusive right to use an air navigation facility on which Government money has been expended" in violation of 49 U.S.C. Section 40103(e).

---

motion, requiring the City to answer (14 C.F.R. § 16.26(b)(5)). (That case has since settled without an express determination regarding the Airport's status as a facility bound by Section 40103(e).)

[8] https://www.faa.gov/documentLibrary/media/Order/Order_5190.6B_Compliance_Chg3.pdf

[9] *Available at* https://www.codepublishing.com/CA/Torrance/#!/Torrance05/Torrance0501.html#51.2.31

[10] An interesting exclusion, as the City's Municipal Code forbids such operations: "All take offs and landings of aircraft shall be made on the runway only." Torrance Municipal Code § 51.2.3(c).

48.     The City of Torrance staff reports leading up to this change make this clear. The City's Staff Report linked to from the agenda for the November 28, 2023 City Council Meeting, where landing fees were discussed and the ordinance was first approved, evidence that during the July 25, 2023 City Council meeting, the City Council requested that certain restrictions and exemptions be placed on the applicability of landing fees as outlined below:

(a)     Landing fees would apply to transient aircraft; and,

(b)     Landing fees would apply to flight schools with three or more aircraft in their fleet; and

(c)     An exemption would be granted for military, public safety, medical, and *Torrance-based rotary wing aircraft manufacturers.*

49.     The last provision is about Robinson Helicopter, which operates its factory at the Airport. On page 2 of that report: "Currently, there is only one operator at Torrance Airport that operates and maintains its own helipads. Robinson Helicopter maintains its own helipads on its leasehold as part of its lease with the City of Torrance. A copy of the current lease is attached as Attachment G. Since Robinson Helicopter is not using the runways and public helipad for landings and is operating and maintaining its own helipads through its leasehold with the City, Robinson Helicopter would be excluded from the landing fees."

50.     The City of Torrance itself identifies this as an exclusive right. Robinson Helicopter gets excluded from paying landing fees while everyone else has must pay.

## ADOPTION OF LANDING FEES ORDINANCE WAS ARBITRARY AND CAPRICIOUS AND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

51.     Ordinance No. 3927 is in the nature of a zoning ordinance because it imposes a fee for landing an aircraft on City property (i.e., the Airport), which is a restriction on the use of property.

52.     For the first time, on November 28, 2023, City staff included in City Council Agenda Item 10B an express finding claiming, "The landing fees, as adopted, are

necessary to offset the City's costs incurred in maintaining and operating the airport facilities." However, no evidence was presented or expressed to support this finding.

53.    The City's Charter, Article 15 – Airport Fund section 1500 requires that "all fees, toll, rentals, charges, proceeds from the sale of property, and other revenues received by the City from or in connection with the use or operation of any airport facilities owned, controlled or operated by the City shall be placed in the said Airport Fund."

54.    City Charter section 1501 requires, "Moneys in the Airport Fund shall be used only for the following purposes and in the following order of priority, to wit: [¶] 1) For the payment or providing for payment, including payments into any reserve or sinking funds, as the same falls due, of the principal of and interest on any bonds of the City, issued for the acquisition, construction, improvement or financing of airport facilities or for additions, betterments, extensions or capital improvements thereto. [¶] 2) For the current, necessary and reasonable costs and expenses to the City of operating and maintaining airport facilities owned, controlled or operated by the City, but without allowance for depreciation or obsolescence, or for additions, betterments, extensions or capital improvements thereto. [¶] 3) After paying or providing for all payments under subparagraph (1) above which are due or which will become due during the next ensuing twelve (12) months' period, and after paying or providing for all current costs and expenses under subparagraph (2) above, any balance which remains from time to time in the Airport Fund and the several accounts therein may be used for the purpose of acquiring, constructing, or improving airport facilities or for additions, betterments, extensions or capital improvements thereto (including deposits in reserve or depreciation reserves or accounts established for that purpose), and any part of such balance not then needed for such purposes may be used for any lawful purpose."

55.    Annually, City diverts millions of dollars from the Airport Fund to the City's General Fund.

56.    On information and belief, TAA thereon alleges that the City's annual diversion of moneys from the Airport Fund to the City's General Fund is approximately

1  10 million dollars per year and constitutes substantial evidence that City does not need

2  landing fees for the operation or maintenance of the Airport, but for the improper

3  purpose of regulating flying aircraft by financially discouraging flights to the Airport.

4      57.    On November 28, 2023, during the first reading of the Landing Fees

5  Ordinance, Jim Gates and others provided testimony and evidence that City diverted $10

6  million from the Airport Fund to the City's General Fund annually and thus, the landing

7  fees revenue is unnecessary.

8      58.    Since City does not require revenue of landing fees to maintain or improve

9  the Airport, the adoption of Ordinance No. 3927 is in excess of the City's police power.

10  City cannot arbitrarily or capriciously enact unneeded landing fees under its police power.

11      59.    As a result, the City's adoption and imposition of landing fees per Ordinance

12  No. 3927 was, and is, arbitrary and capricious because there is no evidence to support

13  City's express finding of economic need.

## THE CITY'S UNREASONABLE LANDING FEES ARE IN VIOLATION OF FEDERAL LAW

16      60.    The City's arbitrary and capricious landing fees are additionally a violation of

17  49 U.S.C. § 40116(e)(2)[11].

## ORDINANCE NO. 3927 IS AN INVALID SPECIAL TAX THAT HAS NOT BEEN VOTER APPROVED

20      61.    Per Government Code section 50076, landing fees at the Airport is a special

21  tax subject to the two-thirds vote requirement of section 4 article 13A of the California

22  Constitution.

23      62.    On information and belief, TAA thereon alleges that the landing fees of

24  Ordinance No. 3927 exceeds the reasonable cost of providing the service or the regulatory

25  activity for which it is charged.

26

27

28

---

[11] The City may only "levy or collect ... *reasonable* ... landing fees, and other service charges from aircraft operators for using" the facilities of the Airport. (Emphasis added.)

AMENDED PETITION

63.    City failed to provide substantial evidence that the landing fees of Ordinance No. 3927 is a reasonable cost of providing the service or the regulatory activity for which it is charged.

64.    On information and belief, TAA thereon alleges that Ordinance No. 3927 is also an unreasonable, unconstitutional special tax subject to the two-thirds vote requirement of section 4 article 13A of the California Constitution.

65.    City did not conduct an election to obtain voter approval to impose the landing fees of Ordinance No. 3927. Thus, Ordinance No. 3927 is invalid.

## FIRST CAUSE OF ACTION

*(WRIT OF ADMINISTRATIVE MANDAMUS PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1094.5 TO COMMAND CITY TO VACATE ORDINANCE NO. 3927 AND RETURN ALL COLLECTED LANDING FEES.)*
*[AS AGAINST CITY AND ROES 1 THROUGH 10]*

66.    TAA realleges and incorporates by reference each paragraph above and below, as though fully set forth herein.

67.    TAA has a beneficial interest in the outcome of the proceedings because its members are subject to the imposition of landing fees.

68.    TAA's members, as represented by TAA, has a clear, present, and legal right to not pay landing fees for the improper purpose of regulating and limiting flying aircraft and paying fees that are not necessary for the operation of the Airport.

69.    TAA has exhausted all available administrative remedies required to be pursued by it.

70.    TAA lacks any plain, speedy, and adequate legal remedy to challenge City's decision to adopt and impose landing fees at the Airport because no provision of Torrance Municipal Code, statute or common law provides a legal cause of action to challenge Ordinance No. 3927.

71.    Without substantial evidence of economic need, City's adoption of Ordinance No. 3927 was arbitrary and capricious.

18
AMENDED PETITION

SHABY & ASSOCIATES

72.    City violated section 4 article 13A of the California Constitution by failing to submit Ordinance No. 3927 to the voters as a special tax.

73.    TAA seeks this Court's Judgment and issuance of a peremptory writ ordering City to vacate and repeal Ordinance No. 3927 and refund all collected landing fees.

## SECOND CAUSE OF ACTION

*(WRIT OF TRADITIONAL MANDATE PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1085 TO COMPEL CITY TO VACATE ORDINANCE NO. 3927.)*
*[AS AGAINST CITY AND ROES 1 THROUGH 10]*

74.    TAA realleges and incorporates by reference each paragraph above and below, as though fully set forth herein.

75.    TAA has a beneficial interest in the outcome of the proceedings because its members are subject to the imposition of landings fees.

76.    City arbitrarily and capriciously adopted Ordinance No. 3927, and thus, the Landing Fees Ordinance is invalid.

77.    TAA has exhausted all available administrative remedies required to be pursued by it.

78.    TAA lacks any plain, speedy, and adequate legal remedy to challenge City and ROES 1 through 10's decisions to impose landing fees.

79.    Without substantial evidence of economic need, City's adoption of Ordinance No. 3927 was arbitrary and capricious.

80.    City violated section 4 article 13A of the California Constitution by failing to submit Ordinance No. 3927 to the voters as a special tax.

81.    TAA seeks this Court's Judgment and issuance of a peremptory writ ordering City to vacate and repeal Ordinance No. 3927 and refund all collected landing fees.

## PRAYER FOR RELIEF

WHEREFORE, TAA respectfully prays for judgment against Respondents, and each of them, as follows:

1.      For a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5 commanding City and ROES 1 through 10 to vacate and repeal Ordinance No. 3927 and refund all collected landing fees.

2.      For a writ of traditional mandate pursuant to Code of Civil Procedure section 1085 commanding City and ROES 1 through 10 to vacate and repeal Ordinance No. 3927 and refund all collected landing fees.

3.      For a permanent injunction barring the City's illegal attempt to govern aircraft in flight by prohibiting low approach and touch-and-go operations at the Airport, in violation of 49 U.S.C. § 40103(a)(1).

4.      For a permanent injunction barring the City's illegal attempt to collect unreasonable and exclusionary landing fees, in violation of 49 U.S.C. 40103(e).

5.      For a declaration of the obligations of the City under federal law.

6.      For Petitioner's costs of suit.

7.      For attorneys' fees pursuant to Code of Civil Procedure sections 1021.5 and 1032 and/or other applicable law.

8.      For such other and future relief as the Court deems just and proper. 2

Respectfully submitted,

DAVID M. SHABY II & ASSOCIATES

Date: December 4, 2024      By: _____

                    R. Christopher Harshman, Esq.
                    Attorneys for Torrance Airport Association

## VERIFICATION

I, the undersigned, declare: All facts alleged in the above document are true of my own personal knowledge. I have read the above Petition for Writ of Administrative Mandate and Traditional Mandate and know its contents. All facts alleged in the Petition are true of my own personal knowledge. I declare

SHABY & ASSOCIATES

1 | under penalty of perjury that the foregoing is true and correct and that this declaration was executed on

2 | December 3, 2024 at Torrance, California.

3

4

5 | Peter Broen, President

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHABY & ASSOCIATES

11624221